The 4th District Appellate Court of the State of Illinois has now convened. The Honorable John W. Turner presiding. Thank you. Good afternoon, everyone. We're here on case number 422-0129. That's N. Ray, the marriage of Peterson. Would counsel for appellate please identify yourself for the record? Yes, your honor, Candace Thompson on behalf of James R. J. Peterson. Thank you. And counsel for appellate, please state your name for the record. H. Wayne Statham appearing as counsel for Carmen R. Peterson. Okay, thank you. Ms. Thompson, you may proceed with your argument. Thank you, your honor. May it please the court and counsel, we are here today because the circuit court improperly denied Mr. Peterson's petition to terminate maintenance on the basis of cohabitation on a resident and continuing conjugal basis. When determining whether cohabitation exists, the case law provides that the court is to look at the totality of the evidence. It also gives a number of factors that should come into their decision when deciding whether a couple has entered out of an intimate dating relationship and into what is known as the de facto marriage. The totality of the evidence that was presented at this trial court shows that Ms. Peterson and her paramour had entered into a de facto marriage. Therefore, the court ruling otherwise is against the manifest weight of the evidence. Now, we have. Excuse me, counsel, good afternoon. Looking at the totality of the circumstances and the evidence in this case, in the light of the analysis that was done in the marriage of Miller here, Carmen and Scott maintain separate residences four hours away from each other, different states and did not commingle finances. So how did their relationship function practically and economically like a marriage? How was it a de facto marriage? Yes, Your Honor. And I think in subsequent cases after Miller, I don't think specifically in the marriage of Churchill, I don't think the financial component is the end all, but they did operate when you look at how they traveled. Her paramour paid for majority of those travel expenses, the hotels. When you look at when they go out to dine, he pays for not only Mrs. Peterson's items, but her children's items. He financially supported and testified that he had to step into the financial role of Mr. Peterson when he stepped out of it. For all practical purposes, they don't share bank accounts. They don't share houses, but they do operate as a married couple would do. There's no question that if Mrs. Peterson needed money, her paramour would provide that support. I think in Miller, it does state that unless otherwise reasonably explained, and I think a possible reasonable explanation the court could look at is the fact that both Mrs. Peterson and her paramour are in later stages of life. They had assets from Mrs. Peterson's divorce and just her paramour acquiring it. Why go through the hassle of retitling everything when you could just continue how they operate right now where her paramour pays for substantially any expense when they go and are interacting with each other? Well, he loaned her money only prior to the divorce. There wasn't any evidence, at least that I recall, where he loaned her money or gave her money other than incidentally when they went out to dinner or perhaps if she drove to his house on a weekend to reimburse for gas. That's $20. I suppose today would be more expensive than $20, but at any rate. Yes, Your Honor, and I think that consistent pattern shows a little bit more than an intimate dating relationship. I think the continuing providing her the support, the money, he also testified that sometimes if she just needed some money because she was short, he would provide her to go eat out with her friends or to provide dinners for her children. I think he has that, and there is that seriousness and commitment in their relationship that meets the financial burden. I also would point out that it's kind of akin to In re the Marriage of Churchill, where no, they didn't share bank accounts, but they did enough sharing of resources and financials and the remaining of the factors to show that this is a de facto marriage. And I think it's key that yes, the trial court obviously pointed out that the financials was a major aspect of life. He did not deny or grant our petition to terminate. But even without those financials in today's dynamics of married couples, we're seeing more and more where people don't share joint accounts. They don't share joint assets, and times are changing, and so should the basis for cohabitation. I don't think we need to look for those traditional ways that are now kind of outdated in today's dating world and marriages. Well, Churchill, even though they didn't live together, had a number of other factors that we don't find here. I mean, didn't they their exchange rings? She took care of in Churchill. They remained in contact. She took care of his cat. She used his name on letters that were delivered. They wore the rings on their respective left hand ring fingers. He always returned to Illinois when he was finished with jobs. And in fact, in this case, when Scott was offered a job in Galesburg, he turned it down. So we don't really have the facts that we have in Churchill in this case. Your Honor, I would agree that there's not an exchange of rings, but I do think an important and unique aspect of this case is when her paramour's mother passed away, Miss Peterson was listed as where you would typically find a spouse. I think that's key of showing a level of permanency and commitment that you reserve traditionally in society, in society in general, for family members. That's who she was survived by and included Miss Peterson's name. I think when you get to that level, it's the same as a ring. You're making representations that people think you're enough to go in your own mother's obituary. I think that is symbolic in of itself. I think there was some testimony that they received during Christmas parties together. They're doing joint clubs together. And when you take that in couple with how they represent themselves to society, and Miss Peterson represents it, it's a clear intended permanence. There's no ending to this relationship. They just had a dominant quoter. I acknowledge that he didn't take that job, but he went through the steps to interview, he went through the steps to search for the job, and then this was all after the filing of our petition to terminate. And then he just said he just didn't take the job. It seems a little coincidental, but I do think even without that factor, you have that. And then I would also add the fact that when Miss Peterson had to fill out an application for a foreign exchange student to host it, the school and that program felt it was necessary for him to do a background check, but not her college-age daughter. So I think there is a substantial amount of time that a third party is feeling, hey, we need to do a background check before we allow a foreign exchange student to go be around him. And then she took that foreign exchange student back and forth on these trips and spent holidays with each other. So I think those are tangible of what we saw in Churchill as well. You also argue that they had unfettered access to each other's homes, but they really didn't randomly show up at each other's homes and walk in with a key. They made arrangements with each other for entry, and they were home actually to let the other person in or made a special arrangement. So that is not something that is consistent with a continuing conjugal relationship, is it? I would say that, no, they didn't have keys. But when her parent, Morse Scott, was there and residing, he parked in the garage. He had his car staying there. He made her daughter move out, or she had her daughter move out of the garage, and he parked in the garage. I think that's unfettered access to a person. She left her back door unlocked. I think Casewell has pointed out that you don't necessarily need a key to have unfettered access. She was home alone without her doing repairs. He clearly was trusted enough that he could strip her house down to the bolts and do all these substantial repairs to her house. So I think there is some access, even without the key. And she, vice versa, had some access to his house as well. But no, there was not a key. But there was enough where she wasn't limiting. I think they gave a heads up to each other. And then he parked in the garage and used her car while she's at work or busy. And they then had unfettered access to each other's cars when they were traveling together on vacation. Counsel, in light of the burden in this case, how do we rule in your favor? I'm sorry, Your Honor, I didn't hear you. In light of the burden in this case, how do we rule in your favor? The burden of the manifest way to the evidence? Correct. Yes, Your Honor. I think when you look at not only the post and the representation to society, you look at their engagements and their sharing of the day-to-day, they testify that they're doing life together. I think that shows that the totality of the evidence in their relationship amounts to a de facto marriage where you can't decide anything otherwise. I think it was against the manifest way to the evidence to state that a couple who spends a substantial amount of time on vacation together just because they don't have a joint bank account doesn't mean they're not acting as a married couple, especially when third background checks. I think those facts alone shows it's against the manifest way to the evidence. The burden includes us looking at the totality of the circumstances and essentially finding the court's findings here were arbitrary. Yes, Your Honor, and I think when you just focus on financials, you're not looking at the totality of the circumstances. I think when you ignore all the other conducts that they did and the representations that they did and that they themselves acknowledge that they're living life together, they're communicating on a daily basis, they're there when the other one needs it, and her paramour is stepping into the role, even going as far as going to a family church camp with her children and attending activities and fundraisers with the children. I think those circumstances make it just to focus on the financial aspects of it to be against the totality of the circumstances. I would say the trial court even acknowledges itself that those factors are all there. They all exist, but because of this one factor, we're not going to say that, and that's against the totality of the evidence. Just because one factor, at case law's point, it is not controlling, doesn't mean that it's not a de facto marriage. So, how is what you have described to us in terms of their actions inconsistent with an intimate dating relationship? Your Honor, I think an intimate dating relationship doesn't take the steps that Miss Peterson and her paramour did. They don't require background checks. They don't list each other in obituaries. They don't go to family church camps. They don't go on expensive week-long vacations, and in the short amount of time, you're talking about 20 trips. They don't then have substantial repairs, and they're making a house together with all these repairs. I understand it's in Miss Peterson's name, but he has poured his efforts by Miss Peterson's own words into this house, and he's showing his commitment, and he's showing that this is intended for permanence. They both have a desire to marry each other, and I think that is what in itself makes it more than an intimate dating relationship. I don't think you have those factors when you're just patently dating someone in a dating relationship. I think even in Miller, that case that pointed out, they were cooling off. They didn't help each other when they fell on hard times. Here, we have something more than that. You have her paramour helping her when she falls on hard times. You have them both intending to stay married or stay in a relationship and having a desire to marry, and then society is viewing them as that married couple. This was all within the discretion of the trial court to weigh these factors. In fact, Miller tells us that it's not enough just to mention the factors, but it's the achieve a gravitas, that is a certain depth. Again, wasn't this within the discretion of the trial court to actually look at and weigh those factors? I think the trial court acknowledged that those factors exist, but only placed weight on the financial component. So the gravitas of their dynamics that even their own trial court acknowledged existed was misplaced. I think it shouldn't have been focused on the fact that they don't have a bank account together. It shouldn't have been focused on the majority of those factors and the majority of their conduct and their own words and behavior amounts to that gravitas. I think the discretion was misplaced. I agree it's not an abuser's discretion. It's just against the manifest weight of the evidence. And here, I think the evidence lies with Ms. Peterson entering into facto marriage. The decision to do the background check was not the party's, that it was not the Carmen's decision, but rather it was the school district's policy regarding who frequented that home. Isn't that correct? It was not their decision that there should be a background check. They submitted it to the school district. To the rules and regulations of the school district with respect to a foreign student. Yes, your honor. I would agree that the school was the one who conducted the background check. I think Ms. Peterson was the one who had to list the individuals she felt were in need of it. And I recall the testimony had stated that she felt that based off of what they were telling her, she needed to list him because he was going to be spent a substantial amount of time around this foreign exchange student. If she hadn't put him on that list, it would have happened just like her college-age student. There wouldn't have been a background check. She had to intentionally fill it out, acknowledging that he was spending a significant amount of time that would warrant them to do this. Without her filling that out, they wouldn't have conducted that. College-age student was family. He was not family, correct? Correct, your honor. It was her daughter, her daughter and Mr. Peterson's older daughter. Yes. Who stays with Ms. Peterson during breaks from school as she comes back. So your honors, unless there's any other questions, if I may, I have a few other, I can keep facts to look at if I may proceed on those. I think the involvement with Ms. Peterson's children, including the minor ones, also show this is more than an intimate dating relationship. Ms. Peterson is at the level with her paramour that she's okay with her minor children sharing a hotel room with him. She's okay with them spending holidays, proposing their traditions to be with him. And he then takes on that role of supporting them at their cross-country meets. She posts then about how great they're doing this. This is a representation that he's stepping into that stepfather role and even amounts to that they went to a family church camp in Iowa, the same one that Mr. Peterson and Ms. Peterson went during their marriage. And they intend on going in the future to this. They would like to do this more. That camp is for families to go and bond with the church. I think, again, that's another representation that this is more tantamount to what you would see a stepfather doing and not what you would just see an intimate dating relationship. You're not talking about just a birthday card or a few happy birthdays here. You're talking about he is there for every single holiday that she has those children. He is there for their events and their cross-country meets. This is, again, another distinction of just an intimate dating relationship where maybe they catch a few ones. But here, they're traveling with the children. They're taking them. They're doing cross-country. He's actively participating in these events. I also think it's clear by her parents testimony that he felt he had to assume this role. He said that he had to, when Mr. Peterson wasn't financially supportive, he needed to step up into that role and provide that support. I think it's very clear. Paramore has an intended permanency of this relationship and desire to marry her. They have talked about marriage. They've talked about living together. Not once have you heard any testimony that they were cooling down, they were going to break up, that they weren't going to continue to spend a significant amount of time. They, quite frankly, spend all their free time together and vacation. Excuse me, counsel. I'm not sure where on the record you get that. My recollection is that they spent about three weekends, two to three weekends a month together and five to 10 days during the year together. I'm not sure where you say they spent their entire time together. Your Honor, I would also think that is just on a routine basis. When you add holidays and then the vacations and trips they've taken, that's where I'm saying they spend a lot of their free time together, their vacation days. They're spending their weekends. There's one on average, maybe one or two weekends a month that they're not spending with each other and when they're not, they're in daily communications with each other. I agree that it's not the weekdays there and it's not the whole calendar year, but I do think that amounts to something when it's the time that they have for leisure to do what they want. They're choosing to spend it with each other when they're not required to be working. I saw that I have two minutes left. Unless Your Honor has any questions, I would like to reserve the rest of my time for rebuttal. I see no further questions and you will have rebuttal. Mr. Stanton, you may proceed. Thank you, Your Honor. May it please the court and counsel. I guess the interesting thing about this case and whenever this issue comes up is the language in 750 ILCS 5-10-C, no court's ever been able to define cohabitation on a resident, conjugal, continuing basis with any kind of exactitude. It's kind of like you know it when you see it and the only instruction trial courts are really given is to look at the totality of the circumstances, which is exactly what the court did here. The counsel points to some facts that she believes weren't sufficiently considered by the court in this balancing test, but I find it interesting and some of the court's own questions kind of played into this. A lot of the facts relied upon occurred before the divorce. It is relied upon that both Carmen and Scott, her boyfriend, engaged in sexual activities and became exclusive to each other. The testimony was this occurred before the divorce. There is a lot of talk and brief and argument about Scott somehow taking on the role of provider for Carmen and her children. The only time that's referenced is when Scott made a loan to Carmen before the divorce, which was fully paid back. There is no testimony that he ever assumed that she thought he assumed or he thought he assumed that role after the divorce. As the questions to counsel pointed out, the only financial assistance given after the divorce was handing some gas money to her a couple times when she drove over to his house to help offset the expense of coming to visit him. Him paying for some meals when they went out and him paying for hotel rooms sometimes when they went out. No other financial support. No other financially commingling. Neither one of them taking the position that he was the financial provider in any way, shape or form for her or her family. Counsel? Yes. But if we look at how she described him as part of her family, isn't that indicative of a de facto marriage? Isn't that one of the things we would look at? In my brief, I tried to respond. The only references that come up with the word family, there are two particular references that came up. One is there was a reference about getting a cat, and she said a new addition to our family. But when asked directly at trial, she asked, were you referring to him and you and the kids as the family? And she said, no. That's not what I was referring to. It didn't even want the cat. I was taking it home to my family. There's another reference when she mentions the word family that's brought up in a social media post. And then she was asked, you know, she refers to everybody in this picture as family. He's in the picture, but so are a lot of other people that she says she considers like family. She never does a social media post or anything like where she says she and Scott are a family. Well, what about the fact that he took time off from work to fix up her house? Isn't that a sign that certainly there's a high degree of commitment and permanence to their relationship? I think it showed there's a high degree of love. I don't think there was any indication of permanence to the relationship by saying he intended or they intended her home to become their home. He's a handyman. He goes to visit his girlfriend. He wants to please her. She has projects around the house. I think the interesting thing about all those projects is he never decided upon what projects were to be done. He never paid for a single material. All he did when he would go to her house and she would say, I got some new ceiling fans. I'd like them to put up. He helped her put them up. I'd like a bigger closet. I bought these materials. He would help her make the bigger closet. There's never any evidence that they intended to make that their home. What's the weight that the court should consider with regard to listing his name in the obituary? I thought that was a very interesting piece of evidence that came out. I think it goes back to one of the court's questions about similar to the foreign exchange student application. Neither Scott nor Carmen did that. Did someone in Scott's family view them as a pair of a couple who had been together a long time and do that? Yes, but that was nothing that either Scott or Carmen ever did. That was something someone else took upon themselves to do. There are, again, going back to counsel's arguments, two cases are heavily relied upon by counsel in this case. One is this court's own case of Miller. And I tried in my brief to explain that I think Miller has been misused, I'm sorry, Heron has been misconstrued many times by courts. And I'm looking forward to the court this time clarifying the opinion in Heron. The opinion in Heron, basically what happened in that case was a petition to terminate maintenance had been granted. The maintenance recipient appealed. The interesting thing about that case is the basis of the maintenance recipient's appeal was that she thought the court failed to consider whether or not the cohabitation material affected the recipient's need for support. And the court took the opinion that that is not a legitimate argument. And that was 50% of the holding in that case. The rest of the case, the court decided that it should review whether the trial court was correct in its finding that the cohabitation was resident. And what they did was they just acknowledged that the trial court had found it was resident. The trial court had listed six factors that were relied upon. And they said, in this particular case, those six factors were appropriate. The interesting thing is the court did not even take those six factors, discuss them at length, and apply the facts of those six factors. They just said, in this particular case, the trial court used those six factors. And in this particular case, that was appropriate. The appellate court went on, your court went on to say that the facts they found significant inherent were that Badger, who is the person, the new person in the maintenance recipient's life, he had a resident, residence, but it did not have gas service, heat, or hot water. He spent virtually every single evening of the year at the maintenance recipient's house. He wouldn't even go over to his supposed residence till after 1030 at night just to sleep. He ate all his meals at the maintenance recipient's house with her children. The maintenance recipient paid for all those meals. He used the maintenance recipient's phone for his business phone calls. He even gave the petitioner's phone number, the maintenance recipient's phone number to his clients so they could reach him there. He had a maintenance, he had an obligation under the divorce judgment to pay off a van. She loaned him the money to do that. He kept his business computer at the maintenance recipient's house. It was about to be repossessed. She paid off that loan and loaned him the money. On at least five occasions, she loaned him money to pay his child support obligations under the divorce. None of this is here. This case is nothing like Heron at all. But what courts have done since, and what counsel has done in her argument, her brief, is said, well, if you've got the seven factors the trial court used in Heron, then you should automatically terminate maintenance. But Heron just said, no, those factors were appropriate here, but the test in all cases is totality of the circumstances. That case and every other case says the facts are different in every case that comes before the court. Sorry, I thought someone had a question. Well, you probably thought I was thinking about one, which I was. OK. So Miller, however, I think the court in Miller agreed with your approach. That is that these factors were not exhaustive and that there was something more required just further than their presence in a case. So that, again, that's where the quote comes in regarding the gravitas of these factors. So I think at that point, the second district court, Justice Jorgensen, would have agreed with you. And I think if you look at all of these cases, even the ones that list the seven factors from Heron, there has been more present when they said maintenance should be denied. And the main threat I've seen through those cases is twofold. Number one, the parties were residing together in some way, shape or form. Here, that's not the case. The other is there was a financial commingling between the people. The case of Churchill, the counsel relies upon, there was a lot of commingling. They had shared vet bills. They had joint accounts that they were using together. They had things like that. And none of that is here. The also, when you're looking at totality of the circumstances, there were a couple questions about burden. It is the trial court's role in all this to weigh the factors. And counsel has put her slant on the facts as an advocate for the appellant. I perhaps have put my slant on the facts as advocate for the appellee. But it's the court who is in the best position to hear from these witnesses, to observe them as they testify, to judge their credibility of the testimony, and to sort through all this conflicting testimony and weigh those factors. And I think if you look at the record, the testimony presented, you look at the court's opinion, it's not like his decision was arbitrary. He pointed to facts he relied upon. This is not a case where we're here to second guess his decision. We're here to decide, is it completely against the manifest weight of evidence? With some of the factors that are brought up by counsel, perhaps this was a close call. But I think that's the best you can say. It is a close call. There are a lot of facts that weigh towards this was not a de facto husband and wife relationship. There are some facts that weigh towards perhaps it was. But I don't believe that there's anything you can say it's completely against the manifest weight of evidence. And that would mean that the opposite conclusion was clearly evident, or as you mentioned, arbitrary, correct? A couple other facts that are brought up in counsel's argument. A lot is made of the trips that were made. I want to point out, if you read the transcript of the trial as a whole, Scott and Carmen here are avid runners. And a lot of these 20 trips that are listed were merely trips to a nearby town to participate in a running event. It's not like they were doing world traveling together. There was an extended trip, one extended trip taken. There were some trips to go see plays and shows. But I think when you look at these, if you've got two people engaged in running, who get in an intimate dating relationship, they're going to go to running activities. That's just part of it. Counsel brings in, well, why was he also involved in kids' activities? Well, I think if you look at the transcript, his involvement in the kid activities was completely explained. If you date a woman with children and her children are involved in activities, you're going to the activities if you want to be with her. Interesting point, no evidence he ever traveled besides on a weekend he was already coming here to attend a child's activity. She talked about him spending the majority of their free time together. Interesting point in the evidence was Carmen has summers off. She works for a school district. Their time together never increased when she had her summers off. They were not spending the majority of their free time together. Counsel said something a minute ago about him providing money for her to have dinners or trips with friends or the children. It sounded like an inference that when he was not involved, there's no evidence that he did anything but pick up the tab when he took her and her kids out. I think the bottom line to me in a case like this is what's the purpose of this statute? What's it supposed to accomplish? I think the second district in the case of the marriage was a 1999 case that I cited in my brief. The purpose of this statute is to prevent the injustice of requiring the paying spouse to continue paying maintenance to an ex-spouse who uses the money to support someone else or is receiving support from someone else. I agree that's the purpose here. We can't have Mr. Peterson paying maintenance and that maintenance being used to support someone else, which is clear in this case it's not, or if Carmen is being supported by someone else. It's clear in this case she's not. The only quote support she is getting is Scott paying for meals and sometimes hotel rooms and him helping with projects around the house. But again, financially on those projects, he may be saving her some money. He's never paying for a single material and I don't think his actions are undermining the purpose of this statute. As far as them holding themselves out as a couple, I think the court's questions were right on point. What did they do here that was any different than any intimate dating relationship with people this age? I don't think there was much of a difference. Yes, it's cited in the brief they dressed in couples costumes. Any intimate dating relationship couple is going to do that. Yes, they met each other's families. I don't think that was out of the ordinary. When he visited, he participated in some of the kids activities by attending. I don't think that's out of the ordinary. When he's there visiting for the weekend, he helped with some yard work. That's not out of the ordinary. But again, I don't think that you can say the court ignored some compelling facts here in its balancing test. Yes, counsel brings up some good points, but there are just as many points going the other way. And I don't believe I have any further argument. If the court has any other questions, I'd be happy to answer them. I don't see any questions. Thank you. Is there any rebuttal? Yes, your honor. Briefly. I think the key is what we're looking for is day-to-day entanglements that is akin to a marriage-like state. You do have those day-to-day entanglements. A marriage is not all based on financials. The only thing that counsel has against this is financials. They don't mingle financials. There's so much more to a marriage than that. You have parties who, yes, I agree, at the time, before the divorce, they were in an intimate dating relationship. But at some point in those four plus years, they progressed in something more. They progressed into a relationship that had people holding them out to be a married couple or significant. She's surviving his mother in her obituary. I think that is a significant amount. They are taking vacations out east to visit her family in Virginia and D.C., and then they're going out west to Yellowstone and doing all those things, spending days at a time. Those are expensive. I think we all know those road trips are very expensive between hotels and gas and food, and our paramour is paying for it. He's also doing substantial repairs to a house. You're not just doing that on an intimate dating relationship. The amount and the sniffing, we're not talking about painting. We're not talking about painting a picture. We're talking about a complete remodel. We're talking about grout work, stonework. This is akin to what you would do for your spouse. We have to look at the totality of the circumstances, and only placing weight on the financials fails to look at the actual totality of what's going on here. You have two parties who fully tend on staying together. They're committed to each other. This is a permanent relationship. They make representations. Ms. Peterson, in fact, makes representations that she intends to marry him. They're doing life side-by-side, day-by-day. What is more akin to a marriage than that statement in and of itself? We have a transcript in the record that shows that the court did not just focus on the financials. In fact, the court asked Scott specifically about what he had in terms of personal possessions at Carmen's house as of the date of the hearing that was held and as of the prior date. And so the court was concerned with something more than financials. And of course, the answer was virtually nothing. I guess the day he was at the hearing, he had some personal possessions, including his tools. The day before, if he had been there, the question was, what would you have taken with you if you left? He said nothing. So the court wasn't just concerned with financials. I think that really simplifies the analysis that the court did. Your Honor, I can understand that perspective. And I understand that her paramour did not have clothes or anything there. He had a bag. I think it also makes sense, when he has a household and work, that his tools would come back and forth with him. He does work throughout the week. In there, I don't think that negates the day-to-day entanglements. Just because there's not a tool there or there's not some clothes, that doesn't negate what is being presented to society and how society is in turn reviewing that. And no objections were made when society viewed them or listed them in an obituary. No objections were made. No issues were had with it. They just want to place blame somewhere else. But they then make this acknowledgment and the representation. They don't come out of nowhere with it. It's based on their actions that family would believe. That it's necessary to list her in an obituary. It's based on her actions that the school would need to do a background search. I think the day-to-day entanglements outweigh the lack of financials. And has, at least with the post and the representations and the transcripts that Mace had in your question, what more do they need to do to be a married couple and make that representation? We would ask that the court remand this and find that it was against the manifest way to deny that petition. Thank you. Okay, the court thanks both of you for your arguments today. The case is submitted and we now stand in recess.